# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| v. | : CRIMINAL CASE NO.: |
| SHAMEIK SPINKS | : 1:16-cr-00015-14-AT-JSA |

**ORDER AND REPORT AND RECOMMENDATION**

This case is before the undersigned on the motion of Defendant Shameik Spinks to Suppress Statements [512]. As explained below, it is undisputed that Defendant was in custody at the time he was interviewed by law enforcement and that he was read his *Miranda* rights. Nevertheless, the recording of the interview reflects certain statements by the officers that could have been interpreted as misleading the Defendant as to the legal consequences of his decision to waive his right to remain silent. Thus, the Court cannot find that the Government has met its heavy burden to prove the voluntariness of the Defendant's *Miranda* waiver or, more generally, his decision to make statements. Thus, the Court **RECOMMENDS** that Defendant's Motion to Suppress [356] [512] be **GRANTED**.

### I.     Background

This case is part of a large, multi-defendant action in which various inmates in and employees of certain Georgia state prisons, along with family members and

other outside associates of inmates, allegedly conspired to smuggle contraband (including illegal cell phones) into the prisons. Defendant Spinks was an inmate at Jackson State Prison during his FBI interrogation in this case, on January 7th, 2016. *See* Transcript [508] at 4.

At the conclusion of the evidentiary hearing on August 3, 2016, the Court expressed certain preliminary findings of fact on the record. *See id.* at 17-18. Specifically, the Court preliminarily found that:

> Agent Parker and Investigator Jordan interviewed the defendant while he was serving his sentence in Jackson State Prison; the agents provided him with an Advice of Rights Form, which he signed; he was not in restraints at the time of the interview or in the general population area of the prison; he was in an office within the prison, but not in restraints; and there were no corrections officers present; and Agent Parker and Investigator Jordan were not themselves armed.
>
> Agent Parker testified there were no promises made or threats given to the defendant. There was some questioning with regard to whether or not the defendant knew codefendants prior to the furnishment of Miranda rights and any waiver of those rights, but the Government has represented they will not utilize -- introduce that testimony in the case.

*Id*. Neither party has objected to or pointed the Court to any evidence contradicting those preliminary findings of fact. Thus, the Court adopts and refers to these findings of fact.

In addition to the facts noted at the conclusion of the evidentiary hearing, the Court notes the following based on a review of the recording of the Defendant's interview, which was introduced into evidence as Exhibit 2. As there is no

transcript of the recording, the Court will refer as best as possible to the approximate time counter markings for certain statements.

As Government counsel helpfully disclosed at the hearing, the interrogating FBI agents engaged in some questioning of the Defendant prior to the administration of *Miranda* warnings, particularly as to whether the Defendant was familiar with certain alleged co-conspirators in the case.  The Government has represented that it will not use those statements at trial and therefore the Court does not consider or address the validity of such questioning.

The agents administered *Miranda* warnings to the Defendant approximately three and a half minutes into the recording.  The Defendant responded with a series of seemingly surprised statements, such as, "do I need a lawyer?" "I can get a lawyer?," and "what is this?"  The immediate response of one of the agents was to assure him, "we're not charging you."  Perhaps by way of clarification, the agent then followed that assurance with the more equivocal statement, "you are not charged with anything right now."

Over the next several minutes, the Defendant continually stated that he "wants to know what's going on," and repeatedly asked questions such as whether he needs a lawyer and how long it would take for him to get a lawyer.  In response to Defendant's questions as to whether he needed a lawyer, the agents at one point stated "no no no no, that's not what we're saying."  As to Defendant's statements

to the effect that he "wants to know what's going on," the agents generally stated that they could not inform him of the nature of the investigation unless Defendant first agreed to waive his *Miranda* rights.  They told him, at approximately the 4:30 mark, that the interview was a "two way street," and that he had to first give his "permission" for them to interrogate him before they could inform him as to what was going on.  However, the agents suggested that if they were simply start the interview, the Defendant could always revoke his *Miranda* waiver and choose to stop talking at any time.

In a particularly confusing exchange at approximately the 6:00 minute mark, the Defendant asked about the procedure for obtaining an appointed lawyer and how long it would take, and the agent's response was something along the lines of "so here's the thing, if you tell us you don't want to talk with us, then we can't tell you what's going on, so you'll never know."  Subsequently, the Defendant apparently responded with an indication that he would sign the form, to which one of the agents asked the leading question, "you don't want a lawyer?"  Defendant then executed the *Miranda* waiver form and proceeded to give statements to the agents.

At the conclusion of the hearing, the Court set a deadline for the Defendant's filed post-hearing brief, but indicated that it would reserve deciding whether to require a response from the prosecution until after having considered the

Defendant's brief as well as the recording.  The Defendant filed its post-hearing brief on August 29, 2016 [512].  On August 30, the Court ordered the Government to respond, and particularly to address the implications of the agents' statements that "if you tell us you don't want to talk with us, then we can't tell you what's going on, so you'll never know," and "we're not charging you," on the voluntariness of the Defendant's decision to waive his rights to remain silent [514].  The Government, however, has not responded.

## II.   Discussion

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that a suspect who is in custody must be advised of his rights to remain silent and to the assistance of counsel prior to any interrogation by law enforcement.  The Supreme Court also made clear that the Government has the burden to show the knowing and intelligent nature of a waiver. *See Miranda*, 384 U.S. at 475. Indeed, the Supreme Court made clear that "[if] the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests upon the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id.*

The Supreme Court instructs us to look for two things in assessing this question:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986) (quotation marks and citation omitted).[1]

Defendant first argues that he "clearly invoked his desire to have counsel" and that the agents bullied him into abandoning this invocation by telling him, "no no no no," and "you don't want a lawyer." Plainly, the agents would have violated *Miranda* had they so disrespected a clear invocation of the right to counsel and

---

[1] An incarcerated prisoner is not necessarily "in custody," based solely on his incarceration, for the purposes of an interview about new, unrelated criminal activity. *See Howes v. Fields*, 132 S.Ct. 1181, 1191 (2012). The Government, however, does not contest that the Defendant was in custody, that is, that the other conditions surrounding the interview in combination with his incarceration triggered the necessity of *Miranda* warnings. Indeed, the agents furnished *Miranda* warnings, which is itself a factor suggesting custodial status. *See Tukes v. Dugger*, 911 F.2d 508, 516 n.10 (11th Cir. 1990). Government also conceded at the hearing that it will not use any answers provided prior to the administration of *Miranda* warnings. Moreover, even where warnings may have been unnecessary, once officers choose to administer *Miranda* warnings, they are not free to ignore or interfere with a suspect's invocation of his rights. *See Tukes*, 911 F.2d at 516 n.11; *United States v. Bautista*, 145 F.3d 1140, 1150-51 (10th Cir. 1998) ("[L]aw enforcement officers are not free to give the Miranda warning and then blatantly ignore a suspect's attempt to invoke any right thereunder."). Indeed, regardless of *Miranda*, an agent's material misrepresentations to a suspect as to his legal rights may render a resulting confession involuntary. *See United States v. Lall*, 607 F.3d 1277, 1285-86 (11th Cir. 2010).

affirmatively advised the Defendant to forego such an invocation.  But the Court disagrees with the Defendant's interpretation of the recording.  It is the Defendant's burden to show that he invoked his right to counsel, *see United States v. Alegria*, 721 F.2d 758, 761 (11th Cir. 1983), and even though the Government fails to respond, the Court nevertheless still finds that the Defendant fails to meet that burden on this record.  To the contrary, the snippets quoted by Defendant, out of context, reflect his continued series of questions to the agents as to *whether* he needed a lawyer and how he could go about obtaining an appointed lawyer.  He never at any point in any exchange cited by the Defendant actually expressed an affirmative desire for a lawyer.

    Defendant also argues that the agents made inaccurate statements to induce him to waive his *Miranda* rights, including statements that undermined the "very basis of *Miranda* protection."  Def. Mot. [512] at 7.  As noted above, it the Government's "heavy burden" to demonstrate that the Defendant knowingly, voluntarily and intelligently waived his *Miranda* rights.  *Miranda,* 384 U.S. at 475.  Generally, a waiver resulting from an officers' misleading advice of law that is inconsistent with the protections of *Miranda* cannot be said to have been knowingly, voluntarily and intelligently made.  *See, e.g., Lall*, 607 F.3d at 1283 (officer's assurance to defendant, despite furnishment of Miranda warnings, that he "was not going to pursue any charges against him," contradicted those warnings

and rendered the defendant's Miranda waiver and confession involuntary); *United States v. Beale*, 921 F.2d 1412, 1435 (11th Cir. 1991) (agents procured involuntary waiver by telling the suspect that signing the waiver form "would not hurt him."); *Hart v. Attorney Gen. Of the State of Fla.*, 323 F.3d 884, 894-95 (11th Cir. 2003) (officer contradicted Miranda and rendered a waiver involuntary by telling a suspect, in response to the suspect's questions about whether he should get a lawyer, that one disadvantage of having a lawyer would be that "the lawyer would tell Hart not to answer incriminating questions," whereas "honesty wouldn't hurt him.").

The Court's primary area of concern is the Defendant's inquiry as to how long it would take to get an appointed lawyer, and the agent's immediate response, "so here's the thing, if you tell us you don't want to talk with us, then we can't tell you what's going on, so you'll never know." This exchange is confusing on a number of levels. It appears that the agent likely believed she was answering a different question, that is, the Defendant's repeated inquires as to what the FBI was investigating. But that was not, in fact, the question that precipitated this response. Defendant had asked a very different question, that is, how long it would take for the Defendant to get a lawyer. Therefore, the agent effectively told the Defendant that "[he]'ll never know" how he could get an appointed lawyer and how long would it take, unless he first agreed to sign the *Miranda* waiver, and

"talk with us."

This communication breakdown appears to have been unintentional on the agent's part or at least the Court has no reason to believe otherwise. But the agent's motives are less important than how the Defendant could have reasonably interpreted what was said. The Court finds that the Defendant could easily have interpreted the agent's response as fundamentally contradicting *Miranda*. *Miranda* requires that the Defendant be advised of his right to remain silent and, in addition, of his right to a lawyer, including an appointed lawyer if he could not afford one. To suggest that his access to an appointed lawyer hinged on whether he first waived his right to remain silent and "talk[ed] with us," fundamentally undercut this advice. In essence, such language literally suggested that the suspect had the choice between *either* remaining silent *or* obtaining a lawyer. Obviously, such advice would be wrong. But that is how this exchange could easily have been interpreted by the Defendant.

To be sure, no precedent of which the undersigned is aware obliges officers to affirmatively advise suspects as to exactly how and when a court might appoint a lawyer. But the agents here did not simply decline to answer the question or refer him to the Court. Rather, they responded, "so here's the thing," and basically told the Defendant he would "never know" what it would take to get a lawyer, without first waiving his *Miranda* rights. This was a misstatement of law. And all

of this came at the culmination of an otherwise confusing three-minute exchange during which the Defendant was clearly worried about needing a lawyer.

The agent's "you'll never know" advice is confusing in another potential respect. Even assuming–as the Court does–that this exchange was the result of a unintentional miscommunication, the legal advice imparted to the Defendant still appears to be inaccurate under any analysis. At best, the agent appeared to intend to say that the Defendant will "never know" "what's going on," that is, what the case was even about, unless he agreed to waive his rights and "talk with us." Even this was not literally true, however. Of course, the Defendant lacked any right to be informed during the interview as to "what's going on." But the agent did not limit her statement to Defendant's current right to know. She said that he would "**never** know" "what's going on"–ever–unless he waived his *Miranda* rights. This advice contradicted the many rights any Defendant would ultimately have if and when charged, including the right to be informed of the charges in open court, the right to an indictment that sufficiently discloses the nature of the charges against him, and the right to receive the Government's discovery. These rights would not have been diminished by any decision by Defendant to invoke his rights during the interview. And the Defendant would be entitled at that point–only after learning of the details of charges against him–to then decide whether to speak with the investigators.

The agents may not have known with certainty at the time of the interview whether the Defendant ultimately would be charged or not, although they clearly believed they possessed evidence of his guilt. Given even the possibility of future charges, however, it was at least highly misleading to suggest that the Defendant's only way to ever learn what the case was about was to waive his rights and sit for an uncounseled interview right then and there.

\* \* \* \*

Ultimately, the Government, by not responding as ordered, leaves the Motion to Suppress unopposed. Nevertheless, the Court has also considered the issue on the merits. The Court concludes, on this record, and for the reasons stated above, that the Government has failed to meet its burden to show a knowing, voluntary and intelligent *Miranda* waiver. Regardless of whether *Miranda* even applied, in these circumstances the Government cannot sustain its burden to prove the voluntariness of a confession that resulted from such misleading advice of a defendant's legal rights. *See Lall*, 607 F.3d at 1285-86. Thus, the Motion should be granted.

## CONCLUSION

As explained above, the undersigned **RECOMMENDS** that Defendant's Motions to Suppress Statements [356] [512] be **GRANTED** and that Defendant's statements to the FBI on January 7th, 2016 be **SUPPRESSED**.

The Court previously **GRANTED IN PART AND DENIED IN PART** the Defendant's Motion for Bill of Particulars [358], as stated at the pretrial conference on March 28, 2016, [391] so the **CLERK** is **DIRECTED** to terminate the pendency of that motion.  The Court **DEFERS** the Motion to Sever [357].

As there is nothing else before the undersigned relating to this Defendant, the Court **CERTIFIES** that this case is **READY FOR TRIAL**.

**IT IS SO RECOMMENDED and ORDERED** this 28th day of September, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE